United States District Court
Southern District of Texas
**ENTERED**
September 29, 2016
David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| GUENTER SCHOTT, | § | |
| On behalf of himself and all | § | |
| others similarly situated, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. H-16-141 |
| VS. | § | |
| | § | |
| NOBILIS HEALTH CORP., *et al*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This is a putative federal securities class action.  The lead plaintiff, Guenter Schott, sued

Nobilis Health Corporation; its former chief executive officer, Christopher Lloyd; and two of its

former chief financial officers, Kenneth Klein and Andy Chen, alleging securities fraud under

§ 10(b)  and § 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b–5, 17 C.F.R.

§ 240.10b–5.  Schott sought to represent a class of investors who purchased Nobilis's stock between

April 2, 2015 and January 6, 2016.  Schott alleges that during this period, the defendants knowingly

made false and misleading statements to investors in Nobilis's Securities and Exchange Commission

filings about the risks associated with Nobilis's business model and the costs of recent acquisitions.

(Docket Entry No. 9).

The defendants moved to dismiss the complaint under Federal Rules of Civil Procedure

12(b)(6) and 9(b), and under the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. §

78u–4(b)(2), (Docket Entry No. 14).  They argue that the amended complaint failed to allege facts

giving rise to a strong inference of scienter and failed plausibly to allege loss causation.  The

plaintiffs responded, (Docket Entry No. 24), and the defendants replied, (Docket Entry No. 28). Based on the pleadings; the motion, response, and reply; the record; the arguments of counsel; and the relevant law, the defendants' motion to dismiss is granted without prejudice and with leave to amend no later than **October 24, 2016**.

The reasons for this ruling are explained below.

## I.       Background

### A.       The Complaint Allegations

Nobilis manages and owns ambulatory surgical centers and other healthcare facilities in Texas and Arizona.  (Docket Entry No. 9 ¶ 39).  The complaint alleges that in December 2014, Nobilis began to pursue a new business strategy that involved "factoring receivables."  Nobilis would buy accounts receivable at a discount, paying cash to the seller and acquiring the risk of collecting on the accounts.  (*Id*. ¶¶ 41–44).  Factoring receivables carries particular risks in the healthcare industry because payments depend on how much third-party insurance companies reimburse.  (*Id.* ¶ 43).

In December 2014, Nobilis allegedly began its factoring-receivables business model by acquiring Athas Health, LLC, for approximately $34 million.  (*Id*. ¶¶ 41, 48).  Schott alleges that accounts receivable comprised 15 percent of Athas's total assets, the largest of its assets.  (*Id*. ¶ 53). As part of the acquisition, defendant Christopher Lloyd, Athas's CEO, became the CEO of Nobilis. (*Id*. ¶ 41).  After the Athas acquisition, Nobilis allegedly spent another $30 million on six more acquisitions through 2015, raising $8 million in capital by selling stock and issuing warrants and options.  (*Id*. ¶ 48).

The Financial Accounting Standard Board's Accounting Standards Codification (ASC) 310-

10-25-3 treats factoring arrangements as loans.  The amount of the receivable is regarded as the principal (an asset) and the factoring commission—the difference between the price paid for the account and the amount ultimately collected—is regarded as interest (a liability) over the period of the loan, from the date of acquisition to the date a patient or her insurer settles the account.  (*Id.* ¶ 46).  Various subsections under ACS 815 require that warrants and options be recorded as liabilities at fair market value.  At the end of each reporting period, a company should report changes in the fair market value of the warrants and options as income or expenses, depending on whether the fair market value increases or decreases.  (*Id.* ¶ 49).

The parties do not dispute that Nobilis improperly accounted for its factoring receivables and its warrants and options through 2015.  (*Id.* ¶¶ 46–50; Docket Entry No. 14 at 3–4).  Instead of booking only the price paid for an account receivable as an asset, Nobilis booked the entire amount of the receivable and recorded liabilities from underpaid accounts at the time of settlement, rather than over the life of the account.  (Docket Entry No. 9 ¶ 47; Docket Entry No. 14 at 3–4).  And instead of recording warrants and options as liabilities, Nobilis incorrectly booked them as equity. (Docket Entry No. 9 ¶¶ 49–50; Docket Entry No. 14 at 3–4).

On January 5, 2016, Nobilis filed a Form 8-K with the SEC, disclosing its previously improper accounting and reporting how it expected the proper accounting methods to alter the positions it had stated on its SEC filings from December 2014 through 2015.  Properly accounting for factoring of accounts receivable decreased Nobilis's assets by $1.7 million, decreased liabilities by $0.3 million, and increased goodwill by $1.4 million.  Properly classifying warrants and options reclassified $2.4 million from equity to liabilities, recognized $442 thousand in additional income in 2013, and recognized $3.7 million in additional expenses for 2014.  (Docket Entry No. 9 ¶ 73).

3

On January 13, 2016, Nobilis filed its Form 10-Q for the third quarter of 2015, confirming the financial restatements from the January 5 disclosure.  Nobilis amended its 2014 Form 10-K to record net revenue of $16.19 million rather than the originally reported $20.25 million.  (*Id.* ¶¶ 77–79).

The parties do dispute the explanation for Nobilis's improper accounting and the resulting January 2016 restatements.  Nobilis contends that it made "honest" mistakes in applying "obscure" accounting rules.[1]  Nobilis asserts that it discovered the mistakes when it switched to a more sophisticated national auditing firm in September 2015 and then promptly took steps to remedy the errors and disclose their effects.  (Docket Entry No. 28 at 8–10).  Schott alleges that Nobilis and its officers knowingly or recklessly misled investors by misrepresenting its revenues and assets. (Docket Entry No. 9 ¶ 67).  Schott contends that the truth about these material misrepresentations was only gradually revealed to the market through a series of partial disclosures, contrary to Nobilis's claims of prompt and vigorous disclosure.

### B.    The Allegedly Fraudulent Statements

Schott alleges that during the class period—between April 2, 2015 and January 6, 2016— Nobilis made false or misleading statements in its: (1) 2014 Form 10-K; (2) 2015 first quarter Form 10-Q; (3) 2015 second quarter Form 10-Q; (4) 2015 Form S-1; (5) amendment to the 2015 second quarter Form 10-Q; and (6) amendment to the 2015 Form S-1.  (*Id.* ¶¶ 51–67).  The following summarizes each alleged misrepresentation:

---

[1] Regarding the recording of warrants and options as equity rather than liabilities, Nobilis states that it misapplied ASC 815-50-15-7I by overlooking a rule that warrants and options issued in a "currency other than the currency in which the issuer primarily conducts business" must be treated as liabilities.  (Docket Entry No. 28 at 7–8).  Nobilis, which trades on the Toronto Stock Exchange, issued its warrants and options in Canadian currency although it uses American dollars to primarily conduct business.  (*Id.* at 7).

A.    Nobilis's 2014 Form 10-K, filed on April 2, 2015, reported net income of $20.25 million and recognized $6.43 million in accounts receivable from the Athas acquisition.  (*Id*. ¶ 51–53).  Nobilis later amended the Form 10-K to record only $16.19 million in net revenue and lowered the value of the Athas accounts receivable by $1.7 million.  (*Id.* ¶¶ 67, 79).  The Form 10-K certified the material accuracy of its statements, as the Sarbanes-Oxley Act of 2002 (SOX) required.  Nobilis's CEO Christopher Lloyd and CFO Andy Chen signed the certification form.  (*Id*. ¶ 54).

B.    Nobilis's first quarter Form 10-Q, filed May 14, 2015, reported net income for that quarter of $3.28 million.  (*Id.* ¶ 55).  Nobilis later amended the Form 10-Q to record only $2 thousand in net revenue.  (*Id*. ¶ 80).  Lloyd and Chen signed the 10-Q SOX certification.  (*Id*. ¶ 57).

C.    Nobilis's second quarter Form 10-Q, filed August 14, 2015, reported net income for that quarter of $2.15 million.  (*Id.* ¶ 59).  Nobilis later amended the Form 10-Q to increase recorded net revenue by $1.7 million.[2]  Lloyd and CFO Kenneth Klein signed the 10-Q SOX certification.  (*Id*. ¶ 61).

D.    On August 28, 2015, Nobilis filed a registration statement on Form S-1 in connection with the sale of 22 million common shares and 3.9 million warrants to purchase common shares.  (*Id*. ¶ 62).  Schott alleges that "Nobilis reiterated financial and operating results that the Company had previously announced" in the SEC filings listed above.  (*Id.*).  Lloyd and Klein signed the SOX certification.  (*Id*. ¶ 63).

---

[2] Per the discussion in Part II.A., *infra*, the court takes judicial notice of Nobilis's public filing to the SEC to note the reported adjustment to the 2015 second-quarter Form 10-Q.  Nobilis Health Corp., Current Report (Form 8-K) (December 29, 2015).

E.     On September 28, 2015, Nobilis filed an amended Form 10-Q/A to reinstate previously redacted material on the 2015 second-quarter Form 10-Q.  (*Id*. ¶ 64). Besides this reinstatement, which did not affect the relevant report of revenues, assets, liabilities, and equity, no other change was made to the information reported on the original Form 10-Q.  Schott does not allege which, if any, defendant signed a SOX certification for the Form 10-Q/A.  (*See id*.).

F.     On October 23, 2015, Nobilis filed an amended Form S-1/A that Schott alleges "reiterated financial and operating results the Company had previously announced" in the filings enumerated above.  (*Id*. ¶ 65).  Lloyd and Klein signed the SOX certification.  (*Id*. ¶ 66).

Schott alleges that instead of disclosing the risk to investors that the newly acquired accounts receivable might default, Nobilis "improperly showed investors only a best-case scenario." (*Id.* ¶ 47).  As a result, Nobilis allegedly overvalued by 36 percent the Athas accounts receivable it acquired in December 2014.  (*Id.* ¶ 67).  Reporting options and warrants as equity instead of liabilities allegedly concealed from investors the true cost of Nobilis's 2015 acquisitions.[3]  (*Id.* ¶¶ 49–50).  Misapplying the accounting procedures allegedly allowed Nobilis to overstate its net income for 2014 by 25 percent and to report net income for the first quarter of 2015 of $3.27 million, when the proper value was less than 1 percent of that amount, only $2 thousand.  (*Id.* ¶¶ 79–80).

---

[3]  Schott notes that Nobilis's January 5, 2016 restated financials admitted that $2.4 million in liabilities had been misclassified as equity during the class period.  (Docket Entry No. 9 ¶ 74).  Schott states the *total* liabilities *and* equity reported on Nobilis's 2014 Form 10-K and 2015 Form 10-Q for the first two quarters, (*Id.* ¶¶ 52, 56, 60), but since the total amount of liabilities and equity would not be affected by misclassifying one as the other, the plaintiffs have not alleged a material misrepresentation on this point. *See In re BP P.L.C. Sec. Litig.*, 852 F.Supp.2d 767, 810 (S.D. Tex. 2012) ("[T]he facts Plaintiffs allege are not tailored to the very detailed assertions contained in the [company's] statements.")

Schott contends that these misrepresentations fraudulently concealed from investors that Nobilis was a failing company, pursuing an unsustainable business model.  (*Id.* ¶¶ 12, 81).

### C.      The Corrective-Disclosure Allegations

Schott alleges that the plaintiffs decided to invest in Nobilis stock in reliance on the misrepresentations in the SEC filings.  Share prices declined from $5.24 on October 8, 2015 to $2.47 on January 7, 2016.  (*Id.* ¶¶ 70, 72, 76).  Schott alleges that this drop in share price resulted from three partially corrective disclosures.

A.      On October 9, 2015, an anonymous post on the financial blog *Seeking Alpha* criticized Nobilis's business strategy.  A summary at the top of the post read: "Accounting red flags: 4 CFO changes in a handful of years, along with recent auditor resignations; potentially overstated revenues; newly acquired acquisitions with Accounts Receivable issues."  (*Id.* ¶ 69; Docket Entry No. 28, Ex. 1).  Schott alleges that because of the post, Nobilis shares fell 27 percent on October 9, 2015. (Docket Entry No. 9 ¶ 70).

B.      On November 11, 2015, after the markets closed, Nobilis announced that its newly hired auditing firm had "identified certain non-cash accounting differences arising in our conversion from U.S. GAAP and IFRS rules and opening balance sheet valuations which will delay the Company's earnings release and the filing of its quarterly financial statements."  (*Id.* ¶ 71).  Schott alleges that because of this announcement, Nobilis shares fell 18 percent the following day, November 12, 2015. (*Id.* ¶ 72).

C.      On January 7, 2016, Nobilis announced the resignation of CEO Christopher Lloyd.

7

(*Id.* ¶ 75).  Schott alleges that Nobilis shares fell 20 percent on January 7, 2016.  (*Id.* ¶ 76).

On January 5, 2016, Nobilis filed a Form 8-K with the SEC admitting errors in the accounting for the Athas acquisition and for the sale of warrants and options.  (*Id.* ¶¶ 73–74).  On January 13, 2016, Nobilis filed financial restatements confirming the errors and revealing a lower net income than its 2014 Form 10-K and 2015 first-quarter Form 10-Q had reported.  (*Id.* ¶¶ 77–80).  Schott does not allege a loss in share value after these disclosures.  Nobilis argues that he cannot allege a loss because the share price actually rose on January 6 and January 13 of 2016, after the disclosures.[4]  (Docket Entry No. 14 at 13–14).

Nobilis argues that Schott has not plausibly alleged fraud or loss causation because signatures on SOX certifications do not establish a strong inference of scienter and because the allegations do not set out facts showing that the corrective disclosures caused the losses in share value.  (*Id.* at 6–12).  Each argument and response is analyzed under the appropriate legal standards.

## II.    The Legal Standards for the Motion to Dismiss

### A.    Rule 12(b)(6)

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted."   In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), the Supreme Court confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short

---

[4] The Seventh and Third Circuits permit taking judicial notice of historical stock prices.  *See IPugh v. Tribune Co.*, 521 F.3d 686, 691 n.2 (7th Cir. 2008); *Ieradi v. Mylan Labs., Inc.*, 230 F.3d 594, 600 n.3 (3d Cir. 2000).  In this case, the court does not need to take judicial notice of whether Nobilis's share values rose on the 6th and 13th of January 2016.  It is sufficient in considering the motion to dismiss that Schott has alleged no losses following the relevant disclosures on or before those dates.  Since Schott has not alleged that the restatements caused the investors' losses, the court does not factor the restatements into its analysis of loss causation.

and plain statement of the claim showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a)(2).  To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570; *see also Elsensohn v. St. Tammany Parish Sheriff's Office*, 530 F.3d 368, 372 (5th Cir. 2008).  In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court elaborated on the pleading standards discussed in *Twombly*.  The Court explained that "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555).  *Iqbal* explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  (citing *Twombly*, 550 U.S. at 556).

"[I]n deciding a motion to dismiss for failure to state a claim, courts must limit their inquiry to the facts stated in the complaint and the documents either attached to or incorporated in the complaint."  *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017 (5th Cir. 1996).  A court may "consider documents integral to and explicitly relied on in the complaint, that the defendant appends to his motion to dismiss, as well as the full text of documents that are partially quoted or referred to in the complaint."  *In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 882 (S.D. Tex. 2001) (internal quotation marks omitted). Consideration of documents attached to a defendant's motion to dismiss is limited to "documents that are referred to in the plaintiff's complaint and are central to the plaintiff's claim."  *Scanlan v. Tex. A & M. Univ.*, 343 F.3d 533, 536 (5th Cir. 2003) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498–99 (5th Cir. 2000).  In securities cases, courts may take judicial notice of the contents of public disclosure documents that the law requires be filed with government agencies, such as the SEC, and that are actually filed with the

agency. *Lovelace*, 78 F.3d at 1018 n.1.  These documents may be considered only for the purpose of determining what statements they contain, not for proving the truth of their contents.  *Id*.  The court may consider such extrinsic materials as matters of public record without converting the motion into one seeking summary judgment.  *See Isquith v. Middle S. Utils., Inc.*, 847 F.2d 186, 193 n.3 (5th Cir. 1988) (quoting 5 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 1366).

When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff a chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice, unless it is clear that to do so would be futile.  *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002).  A plaintiff should be denied leave to amend a complaint if the court determines that "the proposed change clearly is frivolous or advances a claim or defense that is legally insufficient on its face." 6 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1487 (2d ed. 1990); *see also Ayers v. Johnson*, 247 F.App'x 534, 535 (5th Cir. 2007) ("'A district court acts within its discretion when dismissing a motion to amend that is frivolous or futile.'" (quoting *Martin's Herend Imports, Inc. v. Diamond & Gem Trading U.S. of Am. Co.*, 195 F.3d 765, 771 (5th Cir. 1999))).

### D.    Section 10(b) of the Exchange Act and Rule 9(b)

Under § 10(b) of the Securities and Exchange Act of 1934, "[i]t shall be unlawful for any person, direclty or indirectly, . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors."  15 U.S.C. § 78j(b).  SEC Rule 10b–5 implements § 10(b) by forbidding, among other things, the making of any "untrue

statement of material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b–5. The Supreme Court has implied from the text of § 10(b) that it affords a right of action to purchasers or sellers of securities injured by its violation. *Tellabs, Inc., v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318, 127 S.Ct. 2499 (2007). "But the statutes make these latter actions available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345, 125 S.Ct. 1627 (2005) (internal citations omitted).

To state a private claim under § 10(b), a plaintiff must allege: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 641 (5th Cir. 2005) (internal citations omitted). For fraud claims, including securities fraud claims, Rule 9(b) requires the complaint to "state with particularity the circumstances constituting the fraud." FED. R. CIV. P. 9(b). "Put simply, Rule 9(b) requires 'the who, what, when, where, and how' to be laid out." *Benchmark Electronics, Inc. v. J.M. Huber Corp*., 343 F.3d 719, 724 (5th Cir. 2003); *see also Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006). In the Fifth Circuit, the Rule 9(b) standard requires "specificity as to the statements (or omissions) considered to be fraudulent, the speaker, when and why the statements were made, and an explanation why they are fraudulent." *Plotkin v. IP Axess Inc*., 407 F.3d 690, 696 (5th Cir. 2005).

### 1. Scienter

Section 10(b) and Rule 10b–5 do not protect investors against negligence or corporate

mismanagement. *Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 539 (5th Cir. 2008). Under the PSLRA, for "each act or omission alleged," the plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The requisite scienter consists of "an intent to deceive, manipulate, or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *Phillips*, 401 F.3d at 643 (internal quotation marks omitted). Severe recklessness is "limited to those highly unreasonable omissions and misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 866 (5th Cir. 2003) (internal quotation marks omitted).

In *Tellabs I*, the Supreme Court described how to analyze the sufficiency of scienter allegations on a motion to dismiss under the PSLRA. 551 U.S. at 322–23, 127 S.Ct. 2499. First, the district court must determine the factually sufficient complaint allegations and take them as true. *Id.* at 322. Second, the court considers documents incorporated in the complaint by reference and matters subject to judicial notice. *Id.* at 322–23. Third, a court takes into account plausible inferences opposing as well as supporting an inference of scienter. *Id.* at 323. The factual allegations must be evaluated collectively, not in isolation, to determine whether the pleadings support a strong inference of scienter. *Cf. Barrie v. Intervoice–Brite, Inc.*, 397 F.3d 249, 260 (5th Cir. 2005) ("While [the Fifth Circuit] will view a complaint *in toto* when considering whether a complaint has adequately pled scienter, each allegation of fraud must individually meet the

particularity requirements of the PSLRA." (internal citation omitted)).

To be sufficient, the inference need not be "irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Tellabs I*, 551 U.S. at 324, 127 S.Ct. 2499 (internal quotation marks omitted). But it "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.* "The strength of an inference cannot be decided in a vacuum." *Id.* at 323. "To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323–24. "[O]missions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.* at 326 (quoting 15 U.S.C. § 78u–4(b)(2)). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

The Fifth Circuit has rejected "group pleading." A complaint is insufficient if it generally alleges that "defendants" as a group knowingly or recklessly made material misrepresentations. *Shaw Group*, 537 F.3d at 533. A court must look to the state of mind of the individual corporate official making or issuing a statement, "rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Southland*, 365 F.3d at 365–66 ("[W]e do not construe allegations contained in the Complaint against the 'defendants' as a group as properly imputable to any particular individual defendant unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded.").

Corporate officers are not liable for a specific act or omission solely because they are officers, even if their day-to-day involvement in the corporation is pleaded.  *Id*. at 365.  Corporate statements that allegedly misrepresent facts or omit facts necessary to avoid misrepresentation can be connected to a particular officer if plaintiffs allege that the officer signed the document in which the statement appears or they adequately allege the officer's involvement in creating the document. *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006).  But signed SOX certifications support an individual's scienter only "if the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions."  *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 555  (5th Cir. 2007) (internal quotation marks omitted).  A defendant's signature on a SOX certification, without more, does not give rise to a strong inference of scienter.  *Dawes v. Imperial Sugar Co.*, 975 F.Supp.2d 666, 693 (S.D. Tex. 2013); *see also Horizon Mgmt. Inc. v. H & R Block, Inc.*, 580 F.3d 755, 765–66 (8th Cir. 2009); *Zucco Parnters, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009).

## 2. Loss Causation

Under the PSLRA, "the plaintiff shall have the burden of proving that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages."  15 U.S.C. § 78u-4(b)(4).  The PSLRA "makes clear Congress' intent to permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss."  *Dura*, 544 U.S. at 346, 125 S.Ct. 1627.  "To establish proximate causation, the plaintiff must allege that when the 'relevant truth' about the fraud began to leak out or otherwise make its way into the marketplace, it caused the price of the stock to depreciate and, thereby,

14

proximately caused the plaintiff's economic harm." *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 320 (5th Cir. 2014).

"Loss causation in fraud-on-the-market cases can be demonstrated circumstantially by (1) identifying a 'corrective disclosure' (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud); (2) showing that the stock price dropped soon after the corrective disclosure; and (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a 'substantial' amount of price drop." *Id*. at 320–21 (internal quotation marks omitted).

Although the corrective-disclosure information need not "precisely mirror" the alleged misrepresentations, *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) (quotation marks omitted), a corrective disclosure must be "'related to' or 'relevant to' the defendants' fraud and earlier misstatements." *Amedisys*, 769 F.3d at 321. "The test for relevant truth simply means that the truth disclosed must make the existence of the actionable fraud more probable than it would be without that alleged fact, taken as true." *Id.* A corrective disclosure can come from any source and "can be gradually perceived in the marketplace through a series of partial disclosures." *Id.* at 322. When a complaint alleges a series of partial disclosures, the court may analyze each in isolation but should also "consider them collectively in determining whether a corrective disclosure has occurred." *Id.*

### C.    Section 20(a) of the Exchange Act

Under § 20(a) of the Exchange Act, "[e]very person who, directly or indirectly, controls any" corporation that is found "liable under any provision of this chapter . . . shall also be liable jointly

and severally with" the corporation.  15 U.S.C. § 78t(a).  Section 20(a) is a secondary liability provision, and plaintiffs must therefore establish a primary violation under section 10(b) before liability arises under section 20(a).  *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 348 n.57 (5th Cir. 2002).  Accordingly, if a plaintiff fails to state a claim for a primary securities fraud violation under § 10(b) or Rule 10b–5, he necessarily fails to state a claim for control person liability under § 20(a).  *Blackwell*, 440 F.3d at 288.

### III.    The Section 10(b) and Rule 10b–5 Complaint Allegations

#### A.    Do the allegations support a strong inference of scienter?

##### 1.    Group pleading cannot support scienter.

Schott's complaint relies in part on group pleading to allege scienter.  Schott alleges, for instance, that the "defendants engaged in a scheme to overstate the value of the Company's assets" and that "Nobilis contravened GAAP to conceal from investors the extent of the liabilities the Company was incurring to raise capital."  (Docket Entry No. 9 ¶¶ 3, 49).  Group pleading cannot support an inference of scienter.  *Southland*, 365 F.3d at 365; *Blackwell*, 40 F.3d at 285 ("Unlike the Tenth Circuit, our circuit does not permit [group] pleading.").  Individual, not group, pleading is required.  "A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter."  *Southland*, 365 F.3d at 366.  The court must analyze the allegations as to each defendant to determine whether the complaint sufficiently pleads scienter as to that defendant.  *Id.*; *see also Shaw Group*, 537 F.3d at 532–33 ("Consequently, it is only necessary for us to address the allegations claimed to adequately show scienter on the part of the named officers to determine whether the complaint sufficiently pleads scienter." (internal quotation marks omitted)).  "The rejection of group pleading requires

plaintiffs pleading fraud claims against individuals under § 10(b) and Rule 10b–5 to distinguish among the defendants and allege each one's role, intent, and knowledge." *Dawes*, 975 F.Supp.2d at 690 (citing *Southland*, 365 F.3d at 365).

### 2.  Positions in the company cannot support an inference of scienter.

Schott has alleged knowing or reckless misrepresentations based on the 2014 Form 10-K; the first-quarter 2015 Form 10-Q; the second-quarter 2015 Form 10-Q and amended Form 10-Q/A; and the Form S-1 and amended Form S-1, all filed with the SEC in 2015.  (Docket Entry No. 9 ¶¶ 51–67).  Schott does not specifically allege any misrepresentation on the second-quarter Form 10-Q or its amendment.  (*See id.* ¶¶ 59–60); *see also In re BP P.L.C. Sec. Litig.*, 852 F.Supp.2d 767, 810 (S.D. Tex. 2012) ("[T]he facts Plaintiffs allege are not tailored to the very detailed assertions contained in the [company's] statements.").  For the remaining forms, Schott alleges that the misrepresentations are attributable to the individual defendants who signed the SOX certifications accompanying each form.  (Docket Entry No. 9 ¶¶ 54, 57, 61, 63, 66).  Schott contends that a strong scienter inference is established as to all the defendants "[b]y virtue of their positions at Nobilis," because "[a]s the senior managers and/or directors of Nobilis, the Individual Defendants had knowledge of the details of Nobilis's internal affairs."  (*Id.* ¶¶ 96–97).

"[P]leadings of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions with the company."  *Shaw Group*, 537 F.3d at 535 (quoting *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002)).  The Fifth Circuit recognizes a limited exception for small companies in which an officer's position, combined with "a number of special circumstances," can support an inference of scienter.  *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 425 (5th Cir. 2001). "The 'special circumstances' cases exhibit some

17

combination of four considerations that might tip the scales in favor of an inference of scienter," *Local 371 I.B. of T. Excavators and Pavers Pension Trust Fund v. Diodes*, 810 F.3d 951, 959 (5th Cir. 2016), including: (1) a small company where it is more likely corporate executives are familiar with day-to-day operations; (2) transactions "critical to the company's continued vitality"; (3) omitted information readily apparent to the speaker; and (4) statements by the corporate officer that are internally inconsistent. *Id.* The alleged misrepresentations in *Nathenson*, for example, concerned a critical patent for the defendant company, which sold one product covered by that patent. *Nathenson*, 267 F.3d at 425.

None of the considerations support Schott's arguments here. The filings cited in the complaint show that Nobilis is several times larger than companies to which the *Nathenson* exception has been applied.[5] The alleged frauds—improperly accounting for warrants and options and accounts receivable—do not concern central functions of Nobilis's operation, the maintenance and marketing of ambulatory surgical centers.[6] The omission Schott alleges is the failure to follow codified accounting standards, and the inconsistent statements come from the defendants' restated filings in the corrective disclosures made to the SEC. Those allegations fail to bring this action within the *Nathenson* exception for the same reasons they fail to support a strong inference of

---

[5]  According to the August 2015 Form S-1 on which Schott relies, Nobilis has approximately 630 employees; nearly 440 of them are full-time. Nobilis Health Corp., Registration Statement (Form S-1) (August 28, 2015) at 61. *Cf. Nathenson*, 267 F.3d at 425 (32 to 35 employees); *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 342 (5th Cir. 2008) (no employees); *see also Carlton v. Cannon*, — F.Supp.3d —, 2016 WL 2346943 (S.D. Tex. 2016) (183 employees at the defendant company takes the case out of the *Nathenson* exception); *Stephens v. Uranium Energy Corp.*, 2016 WL 3855860 (S.D. Tex. 2016) (61 employees at the defendant company took the case out of the *Nathenson* exception).

[6]  Schott alleges that only one of Nobilis's seven acquisitions in 2014–15 involved factoring accounts receivable—the acquisition of Athas—and in that transaction, accounts receivable comprised only 15 percent of the assets acquired. (Docket Entry No. 9 ¶ 53).

scienter, as analyzed and explained below.[7]

### 3. Misstated SEC filings, on their own, cannot establish scienter.

Correcting accounting errors in SEC filings or a defendant's signature on a SOX certification cannot by themselves support a strong inference of scienter. *Cent. Laborers*, 497 F.3d at 555 ("If we were to accept this proffered interpretation of Sarbanes–Oxley, scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA.") (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006). *Central Laborers* adopted the Eleventh Circuit's test for when SOX certifications could support an inference of scienter. That test requires that the "the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements and omissions." *Id*.

Schott alleges that red flags were present here because Nobilis misapplied two codified accounting standards. But "the mere publication of inaccurate accounting figures, or a failure to follow [Generally Accepted Accounting Practices], without more, does not establish scienter. The

---

[7] By way of foreshadowing, see *Rosenzweig,* 332 F.3d at 867–868 (rejecting the plaintiffs' argument that "the failure of Azurix's core business—water privatization projects—supports the inference that defendants knew, or recklessly disregarded, Azurix's prospects for success" and holding that the plaintiffs must "identify exactly who supplied the information or when they knew the information."); *Abrams*, 292 F.3d at 432 ("A pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company."); *Collmer v. U.S. Liquids, Inc.*, 268 F.Supp.2d 718, 754 (S.D. Tex. 2003) ("Plaintiffs have relied on the judicially created presumption that facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers. . . . [T]he purpose of the PSLRA's particularized pleading requirements leads this Court to find that such an imputation, without some additional facts such as exposure to content-identified internal corporate documents (and who drafted them, who received them or how plaintiffs learned of them) or specific conversations or attendance at specified management or board meetings dealing with such problems, is inadequate to plead scienter." (quotation marks and citations omitted)); *see also Elam v. Neidorff*, 544 F.3d 921, 929 (8th Cir. 2008) (interpreting *Rosenzweig* as rejecting the "core operations method of pleading scienter").

party must know that it is publishing materially false information, or the party must be severely reckless in publishing information." *Lovelace*, 78 F.3d at 1020 (internal citations omitted).

To infer scienter from accounting errors, courts typically examine the magnitude, pervasiveness, and repetition of the errors; the simplicity and obviousness of the misapplied rules; and the defendant's apparent motives for misapplying these rules. *See, e.g., In re ArthroCare Corp. Sec. Litig.*, 726 F.Supp.2d 696, 721 (W.D. Tex. 2010) ("[W]hen the number, size, timing, nature, frequency, and context of the misapplication of accounting principles or restatement are taken into account, the balance of the inferences to be drawn from such allegations may shift significantly in favor of scienter.") (quoting *In re Triton Energy Ltd. Sec. Litig.*, 2001 WL 872019 at *11 (E.D. Tex. 2001)); *In re Medicis Pharm. Corp. Sec. Litig.*, 2010 WL 3154863, at *4 (D. Ariz. 2010) (Allegations that support scienter include: "(1) the magnitude, obviousness, and reasonableness of the violation; (2) the omission in public statements of material facts related to the GAAP violation; (3) the defendant's potential motive or reason for using the accounting methods it did; and (4) other statements or conduct indicating that the defendant intentionally or recklessly misapplied GAAP.") (citing cases).

Courts in this circuit inferring  scienter based in part on improper accounting do so only when other factors strongly support the inference.  In *ArthroCare*, an individual defendant confronted with media reports providing "blatant evidence" of the specific accounting fraud at issue nonetheless "continued to defend [the accounting] stridently and deny the allegations."  726 F.Supp.2d at 716.  Although the plaintiffs in *ArthroCare* alleged accounting errors in eight quarterly SEC filings, and the defendant signed SOX certifications for each filing, the court held that only the two quarterly filings immediately following the detailed media reports could support an inference

20

of scienter. *Id.* at 724. In *In re Seitel, Inc. Sec. Litig.*, 447 F.Supp.2d 693 (S.D. Tex. 2006), the SOX certifications supported a strong inference of scienter because the plaintiffs alleged not only improper accounting practices but also: (1) overstated revenues of 15 percent for the year 2000 and 30 percent for the first 9 months of 2001; (2) memoranda and meeting minutes revealing that the defendants explicitly discussed the improper accounting methods and affirmatively chose to ignore potential problems; and (3) the dismissal of an auditor who confronted the defendants over the improper practices. *Id.*

Schott's complaint does not allege media reports or internal company documents that would permit the court to infer that the individual defendants knew of or recklessly disregarded clear evidence that the accounting used misrepresented the company's financials.[8] The misapplied accounting rules for factoring accounts receivable were alleged to involve one transaction, Nobilis's acquisition of Athas. Athas's accounts receivable comprised only 15 percent of the assets acquired. (Docket Entry No. 9 ¶ 53). Schott does not state precisely how many stock sales involved warrants and options, but reading the complaint in the most favorable light shows that warrants and options could only have accounted for 25 percent of the capital expended on acquisitions in 2014 and 2015. (*Id.* ¶¶ 48–49). Schott alleges that these accounting errors produced material misstatements in two SEC filings—the 2014 Form 10-K and the 2015 first-quarter Form 10-Q—followed by two filings that "reiterated financial and operating results that the Company had previously announced"—the 2015 Form S-1 and Form S-1A. (*Id.* ¶¶ 51–67).

The magnitude of the alleged misstated financials, while surely significant, does not support

---

[8] Schott does not rely on the October 9, 2015, *Seeking Alpha* post as a media report that would support an inference of scienter. (*See* Docket Entry No. 9). Nor in a well-pleaded complaint should he. The post appeared after all but the amended Form S-1/A SOX certifications had been signed by the defendants, and there is no allegation that the defendants knew of the report or issued any response to its claims.

a "strong inference of scienter," 15 U.S.C. § 78u–4(b)(2), without allegations showing a reason defendants knew or were being reckless as to whether the accounting used was improper. Nobilis overstated its 2014 net revenue by 25 percent, and it stated its first-quarter 2015 revenue as $3.27 million when the quarter was close to revenue-neutral. (Docket Entry No. 9 ¶ 67). Schott alleges that the Nobilis officers were motivated to inflate the company's profitability to help it pursue an "acquisition spree." (*Id.* ¶¶ 48–49). These allegations support an inference of negligent mismanagement, but they are insufficient to make intentional or reckless fraud "at least as compelling" as plausible nonculpable explanations. *See Tellabs I*, 551 U.S. at 324, 127 S.Ct. 2499. Nobilis's accounting practices caused it to overstate its first-quarter 2015 revenue but to *understate* its second-quarter revenue by $1.7 million. The correct restatement of warrants and options caused expenses to rise in some quarters, income to rise in others.[9] The improper accounting did not uniformly benefit Nobilis or consistently line up with a motive to skew the accounting results to favor Nobilis's financial position.

As noted, the magnitude of the accounting errors is undeniable. The effect of Nobilis's overstated revenue on its 2014 Form 10-K and 2015 first-quarter Form 10-Q was at least 25 percent incorrect for 15 continuous months (although the 2014 transaction that caused the overstatement for the year occurred in December of that year). (*See* Docket Entry No. 9 ¶¶ 53–55). But the magnitude of the error does not show that the existence of the error was clear when it was made. The fact that the error turned out to have a significant impact on the financials does not, on its own, support an

---

[9] Nobilis's January 5, 2016 restatement notes that properly classifying warrants and options as liabilities should have resulted in $746 thousand in income by the end of the second quarter of 2014 for the decrease in value of those liabilities. The first quarter of 2015 should have resulted in $3.4 million in additional expense for the rising value of the liabilities, while the second quarter should have resulted in $1.7 million in income. Nobilis Health Corp., Current Report (Form 8-K) (December 29, 2015).

inference of reckless disregard for the truth.  *See ArthroCare*, 726 F.Supp.2d at 724; *Seitel*, 447 F.Supp.2d at 693.[10]

The parties dispute the simplicity and obviousness of the misapplied accounting rules. Reading the complaint and the record in Schott's favor, the complaint does not sufficiently allege that Nobilis violated rules that were so clear and obvious as to make the company's officers either knowingly deceptive or severely reckless in certifying their auditor's figures on the SEC filings. The *Seeking Alpha* post on which Schott relies as a disclosure of Nobilis's alleged fraud noted that until its restatements issued, Nobilis was audited by "tiny Calvetti Ferguson, with a total of 38 professionals[; b]arely more than the number of entities it audited at Nobilis."  (Docket Entry No.

---

[10]  The cases Schott cites from outside this circuit do not help his argument.  In *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp.2d 620 (E.D. Va. 2000), the defendants had allegedly reported record high net income of $18.9 million over three years when the company was actually accruing losses of more than $36 million.  In *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F.Supp.2d 1248 (N.D. Cal. 2000), the individual defendants were alleged to have been personally booking numerous false sales over a period of years.  In *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364 (C.D. Cal. July 1, 2008), defendant executives allegedly forced out an auditor who had reported deficiencies in accounting practices to the company.  In *In re Telxon Corp. Sec. Litig.*, 133 F.Supp.2d 1010 (N.D. Ohio 2000), the court emphasized that the defendant company allegedly "overstated its revenues *for years*, did so by over $20 million in a *single* quarter and reported *profits* when it should have been reporting *losses* over *several different quarters*." *Id.* at 1031 (emphasis original). The *Telxon* court contrasted that case with *In re Comshare*, 183 F.3d 542 (6th Cir. 1999), which involved a premature recognition of revenue that inflated a company's income by 9.8 percent in one fiscal year, a "fairly discrete violation of GAAP, which, in turn, had a fairly minor impact on the accuracy of Comshare's statement of revenues" and was "a far cry from the circumstances" alleged in *Telxson*.  133 F.Supp.2d at 1031.  Schott has not alleged that Nobilis misreported profits when it should have reported losses, or that Nobilis fabricated revenue instead of recognizing income prematurely.  In *In re Diamond Foods, Inc. Sec. Litig.*, 2012 WL 6000923 (N.D. Cal. Nov. 30, 2012), the court inferred scienter because the defendant allegedly made "deliberately ambiguous statements" about company payments and attempted to disguise the nature of the payments by "scrubbing" financials before the auditor's review.  In *In re Medicis*, 2010 WL 3154863, the defendants specifically represented they were following the exact accounting rule at issue when they allegedly were not.  *See also In re New Century Sec. Litig.*, 588 F.Supp.2d 1206 (C.D. Cal. 2008) (same). In *In re Reliance Sec. Litig.*, 91 F.Supp.706 (D. Del. 2000), the defendants had allegedly received both external and internal reports and audits indicating their deteriorating financial position.  In *In re Baan Co. Sec. Litig.*, the defendants allegedly made statements in public media articles indicating their knowledge about the accounting rules and the falsity of the financial statements at issue.  All Schott has alleged is that the individual defendants signed SOX certifications; there are no allegations that the defendants commented on compliance with the accounting rules either internally or externally.

28, Ex. 1 at *11).  Schott's factual allegations make it more plausible or at least as plausible to infer that the corporate officers were negligent in relying on the auditors than to infer that the officers knowingly or recklessly disregarded "the presence of glaring accounting irregularities or other 'red flags'" in their financial statements.  *See Cent. Laborers*, 497 F.3d at 555.

### 4.    A officer's resignation, on its own, cannot establish scienter.

Finally, Schott argues that the resignation of CEO Lloyd supports an inference of scienter. Executive resignations are generally "unavailing as proof of the commission of fraud." *Southland*, 365 F.3d at 383; *see also Abrams*, 292 F.3d at 434 (executive resignations did not have "any scienter implications").  "The resignation of officials is, in and of itself, unavailing as proof of the commission of fraud when no specific evidence indicates the resigning officials or their replacements knew of any accounting irregularities or that such irregularities were the reason for their resignations." *ArthroCare*, 726 F.Supp.2d at 724–25 ("Multiple Fifth Circuit decisions suggest resignations have little implication on the scienter analysis."); *see also In re Azurix Corp. Sec. Litig.*, 198 F.Supp.2d 862, 891 (S.D. Tex. 2002) (the defendants' resignations after the loss disclosures made inferring negligent mismanagement more likely than inferring the necessary scienter for culpability).  This allegation is insufficient to plead scienter as to Lloyd.

### 5.    The allegations taken together do not support a strong inference of scienter.

Although "[a] district court may best make sense of scienter allegations by first looking to the contribution of each individual allegation to a strong inference of scienter," it must "follow this initial step with a holistic look at all the scienter allegations." *Owens v. Jastrow*, 789 F.3d 529,  537 (5th Cir. 2015). The question is whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs I*, 551 U.S. at 323, 127 S.Ct. 2499.  "[T]he court must take

into account plausible opposing inferences," including "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id*. at 323–24. "The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?" *Id*. at 323.

At most, the complaint allegations support an inference that the officer defendants were negligent in issuing statements of the company's finances that included accounting errors and in certifying those statements under SOX. There is little support for a plausible—much less strong—inference that they knowingly or with reckless disregard issued statements that incorporated known or obvious accounting errors. There is a strong, plausible, nonculpable inference that the officers relied—whether negligently or not—on an auditing firm that turned out to be inadequately staffed and experienced to handle the company's financials after its new acquisitions.

To survive dismissal under the PSLRA, the scienter inference "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling." *Id*. at 325, 127 S.Ct. 2499. The amended complaint, taken as a whole, does not give rise to a cogent and compelling inference that the defendant officers acted with intent or severely reckless disregard of the likelihood of misleading investors when they signed the 2014 and 2015 SOX certifications.

### B. Do the allegations support a plausible inference of loss causation?

The defendants argue that even if Schott sufficiently pleaded material misstatements or omissions made with the required scienter, the class-action complaint should be dismissed for failure to plead loss causation. To establish loss causation under § 10(b), it is not enough for a plaintiff to allege a stock purchase at inflated prices and a stock-price decline after a negative news report. *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, 597 F.3d 330, 340–41 (5th Cir.

2010), *vacated on other grounds*, 563 U.S. 804, 131 S.Ct. 2179 (2011).  The loss must result from this truth having "ma[de] its way into the marketplace," not as a result of "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions," or other factors independent of the fraud.  *Dura*, 544 U.S. at 342–43, 125 S.Ct. 1627.

The Fifth Circuit has held that the Rule 8(a) and 12(b)(6) notice-pleading standard, not heightened pleading, is sufficient to plead loss causation.  *Lormand v. US Unwired*, 565 F.3d 228, 258 (5th Cir. 2009). ("[W]e conclude that Rule 8(a)(2) requires the plaintiff to allege, in respect to loss causation, a facially 'plausible' causal relationship between the fraudulent statements or omissions and plaintiff's economic loss, including allegations of a material misrepresentation or omission, followed by the leaking out of relevant or related truth about the fraud that caused a significant part of the depreciation of the stock and plaintiff's economic loss or, as *Twombly* indicates, the complaint must allege enough facts to give rise to a reasonable hope or expectation that discovery will reveal evidence of the foregoing elements of loss causation." (internal citations omitted)).  A court is "not authorized or required to determine whether the plaintiff's plausible inference of loss causation is equally or more plausible than other competing inferences, as [it] must in assessing allegations of scienter under the PSLRA."  *Id.* at 267.

The Fifth Circuit has recognized that "undisclosed information cannot drive down the market price of a stock."  *Flowserve*, 572 F.3d 230.  At the same time, "[i]f a fact-for-fact disclosure were required to establish loss causation, a defendant could defeat liability by refusing to admit the falsity of its prior misstatements [a]nd if a 'complete' corrective disclosure were required, defendants could immunize themselves with a protracted series of partial disclosures."  *Id.* (internal quotation marks and citation omitted).  A partial corrective disclosure may suffice, but it must "relate to" or "be

relevant to" "the defendants' fraud and earlier misstatements." *Amedisys*, 769 F.3d at 321. "The test for relevant truth simply means that the truth disclosed must make the existence of the actionable fraud more probable than it would be without that alleged fact, taken as true." *Id*. at 321.

A corrective disclosure can come from any source and "can be gradually perceived in the marketplace through a series of partial disclosures." *Id.* at 322; *see also Lormand*, 565 F.3d at 261 ("[L]oss causation may be pleaded on the theory that the truth gradually emerged through a series of partial disclosures and that an entire series of partial disclosures caused the stock price deflation."). But a "loss caused solely by a general impression in the market that 'something is wrong' is insufficient to establish causation." *Flowserve*, 572 F.3d at 232. When a complaint alleges a series of partial disclosures, the court may analyze each separately, but the court must also "consider them collectively in determining whether a corrective disclosure has occurred." *Amedisys*, 769 F.3d at 322.

Schott alleged that three disclosures caused Nobilis's share price to fall from $5.24 per share on October 8, 2015 to $2.47 per share when the class period ended on January 7, 2016. (Docket Entry No. 9 ¶¶ 69–76). The disclosures were:

(1)     an anonymous post on the blog *Seeking Alpha* titled "Nobilis: About to Fall From Nobility, Part I, 65%+ Downside," which included the line, "Accounting red flags: 4 CFO changes in a handful of years, along with recent auditor resignations; potentially overstated revenues; newly acquired acquisitions with Accounts Receivable issues," (¶¶ 69–70);

(2)     Nobilis's announcement on November 11, 2015 that its third-quarter financial

27

statements would be delayed because its newly hired auditing firm had "identified certain non-cash accounting differences arising in our conversion from U.S. GAAP and IFRS rules and opening balance sheet valuations," (¶¶ 71–72); and

(3)     the resignation of CEO Lloyd on January 7, 2016, (¶¶ 75–76).

The defendants contend that none of these disclosures "relate to" the alleged fraud.  The alleged fraud, according to Nobilis, was: (1) overstating the value of the Athas acquisition by accounting for factoring arrangements under the assumption that Nobilis would collect the full amount the debtor owed; and (2) overstating the company's net income by treating the warrants and options issued to raise capital as equity.  (Docket Entry No. 28 at 14–15).  Schott characterizes the alleged fraud more generally, contending that Nobilis "embarked on an acquisition spree to make Nobilis appear to be growing and applied improper accounting practices to facilitate this plan and make Nobilis appear more profitable."  (Docket Entry No. 30 at *2).  Schott argues that this generalized fraud was disclosed to the market by the blog post, company announcement, and CEO resignation.

Although the Fifth Circuit does not require "fact-for-fact" corrective disclosures to plead loss causation, the alleged disclosures must relate to the specific statements alleged to be misrepresentations to satisfy § 10(b)'s loss-causation element.  *See Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 667 (5th Cir. 2004) (the allegedly corrective disclosure was not sufficiently related to  allegedly false earlier statements about the speed of new routers because the disclosure made "no reference to increased router speed"); *In re Dell Inc., Sec. Litig.*, 591 F.Supp.2d 877, 910 (W.D. Tex. 2008) ("The disappointing earnings or expected earnings statements identified by the Plaintiffs fail to reveal the falsity of any of Dell's prior representations, and therefore do not qualify

28

as a corrective disclosure."); *Magruder v. Halliburton Co.*, 2009 WL854656, at *15 (N.D. Tex. 2009) (loss causation was not sufficiently pleaded because "[d]espite the myriad of statements identified in the subject Complaint, the Plaintiffs simply fail to connect the alleged misrepresentations with correlative corrective disclosures during the Class Period. A corrective disclosure, at a minimum, requires that the prior misrepresentation be identified, and that the fraud of the prior representation be revealed to the market.").

Schott's allegations of "the leaking out of relevant or related truth about the fraud" sufficiently relate to the alleged misrepresentations to state a "facially plausible" claim of loss causation. *Lormand*, 565 F.3d at 258. The *Seeking Alpha* blog post reported the resignation of Nobilis's auditor "follow[ing] closely after the last CFO change in July." (Docket Entry No. 28, Ex. 1 at *1 at 12). The blog post speculated that Nobilis was incorrectly accounting for its equity interests and specifically noted that "Nobilis would attach warrants to all shares sold by [a former CEO and a current chairman of the board], and this appears to have happened at no additional cost to them." (*Id.* at 11). Although the blog post concentrated on the sale of warrants as a warning sign that Nobilis "insider" sales could reflect a lack of confidence in the company and only hinted at accounting impropriety, taking the facts disclosed in the *Seeking Alpha* post as true, those facts "make the existence of the actionable fraud more probable than it would be without" the disclosures. *Amedisys*, 769 F.3d at 321.[11]

---

[11] The blog post did not relate to improper accounting for factoring the accounts receivable. Although the summary line included a reference to "[a]ccounting red flags" over "newly acquired acquisitions with Accounts Receivable issues," the post's content made clear that the anonymous author doubted Nobilis's ability to collect on the accounts receivable acquired from companies that had not collected the deficient amounts. (Docket Entry No. 28, Ex. 1 at *1, 6–8). The post criticized the acquisition of the accounts receivable as a business strategy; the post did not state or suggest that Nobilis was doing anything improper in accounting for the acquisitions. Taking the facts disclosed in the *Seeking Alpha* post as true, those facts relating to accounts receivable did not "make the existence of the actionable fraud more probable than it

The blog post was not a complete disclosure, but it is one of a "series of partial disclosures," including "resignations of CFOs or auditors, [and] announcements by the company of changes in accounting treatment going forward" that can support loss-causation.  *Id*. at 322 (internal quotation marks and citation omitted).  *Amedisys* involved allegations of medicare fraud.  The Fifth Circuit found that: (1) an analyst report speculating without certainty about the fraud at issue; (2) the resignations of a CEO and CIO; (3) a *Wall Street Journal* article reporting on the fraud at issue from sources that were partially available to the public; (4) announced investigations by the SEC and DOJ into the company's suspected gaming of the Medicare reimbursement system; and (5) the company's announcement that second-quarter operating results were affected by "external distractions," taken together, created a "whole [that] is greater than the sum of its parts."  *Id*. at 322–24.  The Court noted that while an officer's resignation "does not in and of itself constitute a corrective disclosure," it "may constitute a portion of the totality that we must consider."  *Id*. at 322–23 (citing *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009)).

In this case, Schott has alleged a media report speculating about accounting errors regarding Nobilis's equity interest and the sale of warrants and options; reports of auditor and officer resignations; and the company's announcement that its third-quarter report would be delayed because it had "identified certain non-cash accounting differences" that could change its reporting going forward.  (Docket Entry No. 9 ¶¶ 69–76).  As in *Amedisys*, those partial disclosures create a "whole" corrective disclosure "greater than the sum of its parts."  769 F.3d at 324; *see also Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200 (9th Cir. 2016) (a stock price decline following announcement of government investigation is sufficient for pleading loss causation, even if stock price did not

---

would be without" the disclosures.  *Amedisys*, 769 F.3d at 321.

decline in response to a subsequent "bombshell" disclosure of the fraud). "Whether the connection between [Nobilis's] misleading statements and the alleged corrective disclosures may ultimately be found too attenuated at a later stage in litigation is a highly fact intensive inquiry that need not be reached at this point."  *Id*. at 325.  Had Schott sufficiently alleged the individual defendants' knowing misrepresentation in Nobilis's financial reports, his allegations of the disclosures of the misrepresentation would support a plausible inference of loss causation.  Given the ruling on scienter, the complaint must be dismissed.  But the court's analysis of the loss causation allegations supports dismissal without prejudice and with leave to amend.

## IV.   Control-Person Liability Under Section 20(a) of the Exchange Act

Schott alleged that the individual officer defendants are liable as "control persons" of Nobilis under § 20(a) of the Exchange Act. (¶ ).  Section 20(a) imposes joint and several liability on "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder" for securities fraud.  15 U.S.C. § 78t(a).  "Control person liability is secondary only and cannot exist in the absence of a primary violation."  *Southland*, 365 F.3d at 383.  Because Schott's primary violation claims under § 10(b) have been dismissed, the § 20(a) claims are dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. This dismissal is also without prejudice and with leave to amend.

## V.   Conclusion

The defendants' motion to dismiss, (Docket Entry No. 24), is granted.  The dismissal is without prejudice and with leave to amend no later than **October 24, 2016**.  The amended pleading must state with particularity the material misrepresentations made by the individual defendants (no "group pleading"), and a basis for scienter beyond the signatures of the SOX certifications.

31

In their motion to dismiss, the defendants request sanctions. (Docket Entry No. 14 at 15–16). They argue that this is plaintiff counsel's third complaint. But it is the first complaint that the court has been asked to consider. The dismissal is without prejudice and with leave to amend; the request for sanctions is denied as moot.

SIGNED on September 29, 2016, at Houston, Texas.

Lee H. Rosenthal
United States District Judge